# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AL HARAMAIN ISLAMIC FOUNDATION,
INC., aka Al-Haramain Islamic
Foundation, Inc.; and
MULTICULTURAL ASSOCIATION OF
SOUTHERN OREGON,
        *Plaintiffs-Appellants,*

        v.

UNITED STATES DEPARTMENT OF THE
TREASURY; TIMOTHY GEITHNER;
OFFICE OF FOREIGN ASSETS
CONTROL; ADAM J. SZUBIN; UNITED
STATES DEPARTMENT OF JUSTICE;
and ERIC H. HOLDER JR., Attorney
General,
        *Defendants-Appellees.*

No. 10-35032

D.C. No.
3:07-cv-01155-KI

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, Senior District Judge, Presiding

Argued and Submitted
March 9, 2011—Portland, Oregon

Filed September 23, 2011
Amended February 27, 2012

Before: Dorothy W. Nelson, Sidney R. Thomas, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber

**COUNSEL**

David D. Cole, Georgetown University Law Center, Washington, D.C., Amanda Shanor, Georgetown University, Lynne Bernabei and Alan Kabat, Bernabei & Wachtel, PLLC, Washington, D.C., Thomas H. Nelson, Thomas H. Nelson & Associates, Welches, Oregon, and J. Ashlee Albies, Creighton & Rose, P.C., Portland, Oregon, for the plaintiffs-appellants.

Douglas N. Letter and Michael P. Abate, Civil Division, United States Department of Justice, Washington, D.C., for the defendants-appellees.

**ORDER**

The opinion filed September 23, 2011, is amended as follows:

On slip opinion page 18090, lines 8-12, delete the two sentences beginning: "In any event . . . ."

On slip opinion page 18093, line 5, add the following footnote after "unreasonable seizures":

In its petition for rehearing, OFAC raises interesting arguments about issues that we need not, and do not, decide. We address only the facts of this case: OFAC's seizure of assets as a result of its designation order of a United States entity located within the United States. We do not address the requirements under the Fourth Amendment for other situations including, for example, designations of foreign entities or designations by executive order. We also make clear that our holding concerns OFAC's original designation order only; we do not address whether a warrant is required for subsequent orders. Finally, we note that a designation order need not specify all details of every asset to meet the Fourth Amendment's particularity requirement. *Cf. United States v. Petti*, 973 F.2d 1441, 1444-45 (9th Cir. 1992) (holding that a " 'roving' wiretap surveillance" warrant meets the Fourth Amendment's particularity requirement).

With these amendments, the panel has voted to deny the petition for rehearing. Judges Thomas and Graber have voted to deny the petition for rehearing en banc, and Judge Nelson has so recommended.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it.

The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or petitions for rehearing en banc shall be entertained.

**OPINION**

GRABER, Circuit Judge:

Plaintiff Al Haramain Islamic Foundation, Oregon ("AHIF-Oregon"), is a non-profit organization, incorporated in Oregon, whose stated purpose is to promote greater understanding of Islam. The United States government suspected AHIF-Oregon of supporting terrorism. In 2004, the Office of Foreign Assets Control ("OFAC"), a part of the United States Department of the Treasury, froze AHIF-Oregon's assets and designated AHIF-Oregon as a "specially designated global terrorist" pursuant to Executive Order ("EO") No. 13,224. President George W. Bush had issued EO 13,224 pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, in the wake of the events of September 11, 2001.

AHIF-Oregon eventually filed this action, asserting that OFAC has violated a variety of its statutory and constitutional rights. Plaintiff Multicultural Association of Southern Oregon, which the government has not accused of supporting terrorism, challenges certain laws that bar it from providing services to designated entities such as AHIF-Oregon. With the exception of one claim not at issue on appeal, the district court granted summary judgment to OFAC.

On appeal, we affirm in part, reverse in part, and remand. We affirm the district court's ruling that substantial evidence supports OFAC's redesignation of AHIF-Oregon as a specially designated global terrorist, and we affirm the district court's rejection of AHIF-Oregon's due process claims. We reverse the district court's rejection of AHIF-Oregon's Fourth Amendment claim and remand for the district court to determine what judicial relief, if any, is available. Finally, we reverse the district court's dismissal of Plaintiffs' First Amendment claim.

## FACTUAL AND PROCEDURAL HISTORY

AHIF-Oregon incorporated as a non-profit public benefit corporation under Oregon law in 1999. AHIF-Oregon describes itself as "an Oregon non-profit charitable organization that seeks to promote greater understanding of the Islamic religion through operating prayer houses, distributing religious publications, and engaging in other charitable activities." It maintains headquarters in Ashland, Oregon, where it formerly owned and operated a prayer house. Its primary activities appear to have taken place in Oregon, though it also was a partial owner of a prayer house in Springfield, Missouri, and conducted some activities there and abroad.

AHIF-Oregon is not the only organization with the name "Al Haramain Islamic Foundation." At the time of its incorporation, organizations with that name existed in dozens of other countries. One of the largest, if not the largest, was AHIF-Saudi Arabia, which had an annual budget of between $30 million and $80 million. Like AHIF-Oregon, AHIF-Saudi Arabia described itself as a charitable organization. AHIF-Saudi Arabia dissolved in June 2004.

The two organizations, AHIF-Oregon and AHIF-Saudi Arabia, shared some leaders in common. In particular, Saudi nationals Aqeel Al-Aqil and Soliman Al-Buthe[1] both held leadership roles in the two organizations. Al-Aqil founded AHIF-Saudi Arabia and reportedly led that organization during much of its existence. He also founded AHIF-Oregon, along with Al-Buthe and two other persons, and served as president of that organization until he resigned in March 2003. Al-Buthe was a senior official of AHIF-Saudi Arabia, where he was primarily responsible for its internet and chari-

---

[1]The names of some persons mentioned in this opinion have several alternate spellings. Consistent with the parties' and the district court's treatment, we use only one spelling. When quoting documents, we have substituted the chosen spelling without notation.

table works in the United States. Al-Buthe resigned from
AHIF-Saudi Arabia in September 2002. Like Al-Aqil, Al-
Buthe was a founding member of the board of directors of
AHIF-Oregon. Unlike Al-Aqil, Al-Buthe has not resigned
from AHIF-Oregon; Al-Buthe maintains a position on the
board to this day.

Shortly after the events of September 11, 2001, President
Bush exercised his authority under the IEEPA by issuing EO
13,224. 66 Fed. Reg. 49,079 (Sept. 23, 2001). Under the
IEEPA, the President may, in specified ways, "deal with any
unusual and extraordinary threat, which has its source in
whole or substantial part outside the United States, to the
national security, foreign policy, or economy of the United
States, if the President declares a national emergency with
respect to such threat." 50 U.S.C. § 1701(a). Relevant here,
the President may

> (B) investigate, block during the pendency of an
> investigation, regulate, direct and compel, nullify,
> void, prevent or prohibit, any acquisition, holding,
> withholding, use, transfer, withdrawal, transporta-
> tion, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect
> to, or transactions involving, any property in which
> any foreign country or a national thereof has any
> interest by any person, or with respect to any prop-
> erty, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B). A person who violates the IEEPA is sub-
ject to civil penalties and, for willful violations, criminal pen-
alties, including a fine up to $1 million and imprisonment for
up to 20 years. *Id.* § 1705.[2]

---

[2]The IEEPA also authorizes the President to issue regulations. 50
U.S.C. § 1704. Pursuant to that authority, OFAC has issued regulations
governing blocked property. 31 C.F.R. §§ 501.801-.808. With one excep-
tion at section 501.807, the regulations do not describe the designation

In the Executive Order, the President declared that the "September 11, 2001, acts . . . constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." EO 13,224 pmbl. The Order "blocked" "all property and interests in property" of 27 persons designated by the Order, and it delegated to the specified agency head the authority to designate other persons with substantial connections to terrorist activities and organizations. *Id.* § 1. Specifically, Section 1 of the Order states that

> all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

> (a) foreign persons listed in the Annex to this order;

> (b) foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals

process or appeals from designations. Section 501.807 states that "[a] person may seek administrative reconsideration of his, her or its designation . . . or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded." The regulation states that OFAC will review all submitted information and "may request clarifying, corroborating, or other additional information." *Id.* § 501.807(b). "A blocked person seeking unblocking . . . may request a meeting" with OFAC, but "such meetings are not required," and OFAC may decline such a request "at its discretion." *Id.* § 501.807(c). "After [OFAC] has conducted a review of the request for reconsideration, it will provide a written decision to the blocked person." *Id.* § 501.807(d). The regulation provides no time frame for OFAC's decision on reconsideration.

or the national security, foreign policy, or economy of the United States;

(c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

(d) except as provided in section 5 of this order and after such consultation, if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, deems appropriate in the exercise of [her] discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

(ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

The 27 persons and entities specifically listed in the Annex did not include Al-Aqil, Al-Buthe, or any AHIF organization.[3] *Id.* at annex.

---

[3]In 2002, President Bush amended EO 13,224 to add one entity and one person, neither of which relates to this case. Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002).

In the years following the issuance of EO 13,224, OFAC periodically designated new persons and entities.[4] Relevant here, by February 1, 2004, OFAC had designated AHIF organizations in six countries: Somalia, Bosnia, Indonesia, Kenya, Tanzania, and Pakistan. But OFAC had not designated AHIF-Oregon, AHIF-Saudi Arabia, or any AHIF organization other than those six in the countries just listed.

On February 18, 2004, federal and state officials executed a search warrant at AHIF-Oregon's Ashland office. The search warrant concerned investigations into possible criminal violations of tax, banking, and money-laundering laws. Agents found, among other things, photographs and other documents related to violence in Chechnya.

The next day, February 19, 2004, OFAC issued a press release stating that it had blocked AHIF-Oregon's assets pending an investigation concerning the potential designation of AHIF-Oregon under EO 13,224.[5] The press release did not state reasons for the investigation. OFAC did not provide prior notice to AHIF-Oregon before blocking its assets, and OFAC did not obtain a warrant to block the assets.

In the months following that press release, OFAC and AHIF-Oregon exchanged voluminous documents on a range of topics. At the request of OFAC, AHIF-Oregon submitted a copy of a Koran that AHIF-Oregon previously had distributed to prisoners and others. The Koran was the only item specifically requested by OFAC.

---

[4]For simplicity, we will refer to persons and entities designated by the President or OFAC under EO 13,224 as "designated persons" or "designated entities." We intend these terms to have the same meaning as the phrase "specially designated global terrorists."

[5]The government states that approximately $20,310 of AHIF-Oregon's assets have been blocked, but AHIF-Oregon counters that that figure does not include $440,000 in proceeds from the sale of the Ashland property. We need not resolve those competing claims; the amount of blocked assets is not material to the issues on appeal.

The bulk of the exchange concerned AHIF-Oregon's possible connections to Chechen terrorism in Russia. The dispute centers on a donation in 2000 by AHIF-Oregon to AHIF-Saudi Arabia of more than $150,000. AHIF-Oregon concedes that it made the donation but strenuously argues that it was intended to be used, and in fact was used, for humanitarian relief in Chechnya. The donation originated from an Egyptian national who apparently wished to funnel the money through AHIF-Oregon. AHIF-Oregon received the funds and then transferred them to AHIF-Saudi Arabia.

In June 2004, while OFAC's investigation of AHIF-Oregon continued, two important events occurred. First, AHIF-Saudi Arabia dissolved. OFAC had not designated AHIF-Saudi Arabia under EO 13,224 or otherwise as a terrorist organization. Second, OFAC designated Al-Aqil as a specially designated global terrorist. At the time, though, Al-Aqil no longer had an official connection to AHIF-Oregon; he had resigned from AHIF-Oregon's board in March 2003.

On September 9, 2004, OFAC issued a press release declaring that it had designated AHIF-Oregon. The press release also stated that OFAC had designated Al-Buthe, even though OFAC had not advised Al-Buthe of any investigation of him. The press release read, in part:

> The investigation shows direct links between the U.S. branch and Usama bin Laden. In addition, the affidavit alleges the U.S. branch of [AHIF] criminally violated tax laws and engaged in other money laundering offenses. Information shows that individuals associated with the branch tried to conceal the movement of funds intended for Chechnya by omitting them from tax returns and mischaracterizing their use, which they claimed was for the purchase of a prayer house in Springfield, Missouri.
>
> Other information available to the U.S. shows that funds that were donated to [AHIF-Oregon] with the

intention of supporting Chechen refugees were diverted to support mujahideen, as well as Chechen leaders affiliated with the al Qaida network.

One week later, on September 16, 2004, OFAC sent a letter to AHIF-Oregon entitled "*BLOCKING NOTICE.*" The letter provided: "You are hereby notified that pursuant to [Executive Order No. 13,224] and under the authorities granted by IEEPA, OFAC has determined that [AHIF-Oregon] is an entity that falls within the criteria for designation set forth in the Order at § 1(c), (d). Accordingly, [AHIF-Oregon] is hereby designated as a Specially Designated Global Terrorist pursuant to the Order." The letter described the legal consequences of the designation, including the blocking of all assets, and warned the organization of the civil and criminal penalties for violations of the IEEPA. The letter concluded that AHIF-Oregon could request administrative reconsideration pursuant to 31 C.F.R. § 501.807.

In early 2005, AHIF-Oregon submitted additional documents for the administrative record and requested administrative reconsideration. In the letter, AHIF-Oregon asserted that it had no connection to terrorism and provided a detailed explanation concerning certain subjects, including the Chechen donation. In the many months following its request for administrative reconsideration, AHIF-Oregon repeatedly sought both an explanation for the designation and a final determination of its request for administrative reconsideration. Like AHIF-Oregon, Al-Buthe requested administrative reconsideration of OFAC's designation of him.

Having received no response to its 2005 request for administrative reconsideration, AHIF-Oregon filed this action in August 2007. AHIF-Oregon brought a substantive challenge to the designation and several procedural challenges. As to the latter, AHIF-Oregon argued that OFAC's use of classified information violated its due process rights, that OFAC's refusal to provide reasons for the investigation and designa-

tion violated its due process rights, and that OFAC's failure to obtain a warrant before seizing its assets violated the Fourth Amendment.

Three months after AHIF-Oregon filed its complaint, in November 2007, OFAC sent a letter to AHIF-Oregon and Al-Buthe notifying them of OFAC's provisional intent to "redesignate" them and offering a final chance to submit documentation. The parties again exchanged many documents, including nearly 1,000 pages of material submitted by AHIF-Oregon.

On February 6, 2008, OFAC sent AHIF-Oregon and Al-Buthe a letter stating that, "after a thorough investigation and review of the evidence in the record regarding AHIF-Oregon and Mr. Al-Buthe, OFAC has determined that AHIF-Oregon and Mr. Al-Buthe continue to meet the criteria for designation." The letter specified three reasons for redesignating AHIF-Oregon: "(1) being owned or controlled by [designated persons] Aqeel Al-Aqil and Al-Buthe, (2) acting for or on behalf of [designated persons] Al-Aqil and Al-Buthe, and (3) supporting and operating as a branch office of AHIF, an international charity that employed its branch offices to provide financial, material, and other services and support to al Qaida and other [designated persons]."

In a memorandum dated the same day, OFAC explained, in more detail, its reasons for redesignating AHIF-Oregon. Much of the document is redacted, but its unredacted conclusions are the same as the ones stated in the letter:

AH[I]F-Oregon should be determined to be subject to Executive Order 13,224 for the following reasons: [1] AH[I]F-Oregon has been owned or controlled by, or has acted for or on behalf of Al-Aqil; [2] AH[I]F-Oregon has been owned or controlled by, or has acted for or on behalf of Al-Buthe; [3] As a branch of the Saudi charity Al-Haramain

> Islamic Foundation, AH[I]F-Oregon has acted for or on behalf of, or has assisted in, sponsored, or provided financial, material, or technological support for, or financial or other services to or in support of Al Qaida and other [designated persons].

(Emphasis omitted.) Four months later, on June 19, 2008, OFAC designated "the world-wide organization of AHIF."

In this action, the district court granted summary judgment to OFAC on all of AHIF-Oregon's claims. The court held that substantial evidence did *not* support OFAC's determination that Al-Aqil owned or controlled AHIF-Oregon at the time of redesignation. But the court found that substantial evidence did support OFAC's other two reasons: that Al-Buthe owned or controlled AHIF-Oregon and that AHIF-Oregon supported designated persons as a branch office of AHIF-Saudi Arabia.

With respect to the procedural challenges, the district court rejected AHIF-Oregon's argument that OFAC cannot rely on classified information in making its designation determinations. The district court next held that OFAC violated AHIF-Oregon's procedural due process rights by failing to provide notice and a meaningful opportunity to respond. But the district court held that the violation was harmless because, even if AHIF-Oregon properly had been informed of OFAC's reasons for suspicion, AHIF-Oregon could not have avoided the redesignation. Finally, the district court held that the blocking of assets is a "seizure" for purposes of the Fourth Amendment. But the court held that OFAC's actions fell within the "special needs" exception to the warrant requirement.

The second named plaintiff in this action is Multicultural Association of Southern Oregon ("MCASO"). MCASO describes itself as "an Oregon public benefit corporation with members, incorporated in 1995 and operating in Medford, [Oregon, as] a non-profit 501(c)(3) organization." "MCASO's objectives include serving as a catalyst in the southern Oregon

community to promote understanding and appreciation between cultures in order to reduce racism, promote and support multicultural education, and provide forums for problem solving related to intercultural differences." Before the designation of AHIF-Oregon, MCASO had co-sponsored events with AHIF-Oregon. MCASO alleged that it would continue to co-sponsor events and conduct other activities in coordination with AHIF-Oregon, were it not for AHIF-Oregon's designation. MCASO asserts that EO 13,224 and its implementing regulations are unconstitutionally vague and overbroad and that they violate MCASO's First and Fifth Amendment rights by prohibiting it from working with AHIF-Oregon.[6] With one exception concerning a claim not before us on appeal,[7] the district court rejected MCASO's claims and granted summary judgment to OFAC.

AHIF-Oregon and MCASO timely appeal.

## STANDARDS OF REVIEW

We review de novo the district court's decision on cross-motions for summary judgment. *Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011). "We review de novo questions of law, including constitutional rulings, resolved on summary judgment." *Nader v. Cronin*, 620 F.3d 1214, 1216 (9th Cir. 2010) (per curiam), *cert. denied*, 131 S. Ct. 1844 (2011). We review for clear error the district court's factual findings. *Sapp v. Kimbrell*, 623 F.3d 813, 821 (9th Cir. 2010).

The judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), govern challenges to OFAC's designation decisions. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-97 & n.18 (2004)

---

[6]AHIF-Oregon also joins in these causes of action but, for simplicity, we refer to these claims as MCASO's claims.

[7]The government originally cross-appealed but soon after filed a motion to dismiss the cross-appeal, which we granted.

(holding that, when considering an agency action as to which the statute does not specify the standard of review, the courts of appeals must proceed pursuant to the APA's general standard of review for agency actions in 5 U.S.C. § 706(2)(A)); *see also Vigil v. Leavitt*, 381 F.3d 826, 833 (9th Cir. 2004) (describing *Alaska Dep't of Envtl. Conservation*'s application); *accord Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). Accordingly, we may set aside OFAC's designation only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, we review for substantial evidence the agency's factual findings. *Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 937 (9th Cir. 2005).

## DISCUSSION

### A.   *Substantive Challenge to the Redesignation*

OFAC supported its 2008 redesignation of AHIF-Oregon on three grounds: (1) that AHIF-Oregon is owned or controlled by Al-Aqil; (2) that AHIF-Oregon is owned or controlled by Al-Buthe; and (3) that AHIF-Oregon provided support to al Qaida and other designated persons as a branch office of AHIF-Saudi Arabia. AHIF-Oregon argues under the APA that substantial evidence does not support those reasons. Like the district court, we conclude that substantial evidence supports the last two reasons, but not the first. We address them in turn, below.

Before doing so, however, we note that AHIF-Oregon also describes its APA challenge in two other ways. First, AHIF-Oregon argues that OFAC reached its decision without affording AHIF-Oregon a meaningful opportunity to respond and thus violated the APA. We occasionally have held that an agency's prejudicial procedural failure violates the APA and, accordingly, have remanded to the agency for reconsideration. *See, e.g.*, *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1162 (9th Cir.

1980) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974)). But the genesis of that rule appears to be the Due Process Clause, rather than a separate statutory grant of procedural rights. *See Bowman Transp.*, 419 U.S. at 288 n.4 ("Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation."). In any event, AHIF-Oregon does not argue with any specificity that its procedural objections under the APA are any different from its identical objections under the Due Process Clause. We address its due process claim concerning inadequate notice in Part B-2, below.

Second, AHIF-Oregon argues that OFAC lacked "authorization" to redesignate AHIF-Oregon. We disagree. The regulations clearly contemplate administrative reconsideration, 31 C.F.R. § 501.807; indeed, OFAC issued its redesignation decision *at AHIF-Oregon's specific request under the regulations*. Just as OFAC has authority to designate an entity, it likewise has the authority to respond to that entity's request for reconsideration, including with updated reasons.

It appears that AHIF-Oregon's primary point is that OFAC's 2008 reasons actually are a post-hoc rationalization for its original 2004 designation and that AHIF-Oregon had no earlier notice of the reasons OFAC eventually gave in 2008. As with the previous argument, we see no difference between this argument and AHIF-Oregon's procedural due process claim concerning inadequate notice, which we analyze below, in Part B-2. We turn, then, to our review of OFAC's three stated reasons and assess whether substantial evidence supports its designation of AHIF-Oregon as a specially designated global terrorist.

1.  *Ownership or Control by Al-Aqil*

**[1]** Al-Aqil was a founding member of AHIF-Oregon. The organization's 2001 tax return described Al-Aqil as the orga-

nization's president. But he resigned from AHIF-Oregon's board in March 2003. OFAC did not take any action against AHIF-Oregon until almost a year later, in February 2004, when it provisionally blocked its funds pending investigation. Having reviewed the record, we agree with the district court that "[t]here is no evidence Al-Aqil was involved with AHIF-Oregon after his resignation, or at the time AHIF-Oregon was designated."

## 2.  *Ownership or Control by Al-Buthe*

[2] Al-Buthe is a designated person. Al-Buthe exercises control over AHIF-Oregon because he is on its board of directors. EO 13,224 authorizes the designation of an entity that is controlled by a designated person. EO 13,224, § 1(c). It is, therefore, a valid reason to designate AHIF-Oregon based on Al-Buthe's control. We agree with the district court that substantial evidence supports this reason.

AHIF-Oregon makes only two counterarguments. Neither persuades us. First, AHIF-Oregon asserts that Al-Buthe's designation—an undisputed fact—is "unfounded." But Al-Buthe did not join this action as a plaintiff or intervenor. Whether Al-Buthe's designation is supported by substantial evidence is simply not before us. A plaintiff cannot collaterally attack the designation of a third party. In short, AHIF-Oregon knowingly retained (and continues to retain) a designated person on its board of directors.

Second, AHIF-Oregon argues that, because OFAC gave no reasons for designating Al-Buthe in 2004, AHIF-Oregon and Al-Buthe reasonably assumed that he was designated not for an independent reason germane to him, but because of his connection to AHIF-Oregon. Al-Buthe asserted in a declaration, filed in the district court, that he would have resigned from the board had he known that the taint flowed from him to AHIF-Oregon, rather than vice versa.

That argument, however, does not challenge the evidence in the administrative record, on which the agency made its decision, and on which we must conduct our review. The evidence in the administrative record demonstrates that Al-Buthe controlled AHIF-Oregon. To the extent that AHIF-Oregon argues that OFAC violated *Al-Buthe's* procedural rights, that issue is not before us because, as noted, Al-Buthe is not a party to this action. To the extent that AHIF-Oregon argues that OFAC violated AHIF-Oregon's own procedural rights, that argument is best viewed as part of the procedural due process claim concerning inadequate notice, discussed in Part B-2, below.

Moreover, to the extent that we could consider evidence beyond the administrative record, such as Al-Buthe's declaration, it remains true that Al-Buthe did not, in fact, resign after the 2008 redesignation and, so far as the record demonstrates, remains a board member of AHIF-Oregon. AHIF-Oregon now has kept on its board of directors a designated person for more than five years, two years since it has known OFAC's reasoning, and that designated person has not challenged OFAC's designation before this court. AHIF-Oregon is "controlled by" a designated person. EO 13,224 § 1(c). There is no basis to set aside the agency action.

3.  *Support of Al Qaida and Other Designated Persons as a Branch Office of AHIF-Saudi Arabia*

**[3]** OFAC asserts that AHIF-Oregon is a branch office of AHIF-Saudi Arabia and that AHIF-Saudi Arabia, through its other branches and perhaps directly, supported designated persons. We have no trouble concluding that substantial evidence supports OFAC's determination that AHIF-Oregon is a branch office of AHIF-Saudi Arabia and of the worldwide network of the Al Haramain Islamic Foundation. One obvious connection is that AHIF-Oregon chose its name to parallel the Saudi Arabian organization's name and the names of other branches. Additionally, three out of four founding members of

AHIF-Oregon were senior officials of AHIF-Saudi Arabia. *See Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("An entity's 'genesis and history' may properly be considered by OFAC in making the designation or blocking, at least where the ties have not been severed." (quoting *Holy Land*, 333 F.3d at 162)). Moreover, several documents in the record demonstrate that, at times at least, AHIF-Oregon described itself to others as a branch office of the larger AHIF organization. Before us, AHIF-Oregon strenuously objects to OFAC's characterization of it as a "branch office" but, given the deferential standard of review and the evidence just described, we are unmoved. Substantial evidence supports OFAC's determination that AHIF-Oregon is a "branch office" of the larger AHIF organization.

The next question is whether, on this record, the larger AHIF organization provided support for al Qaida or other designated persons. That is, the strong connection between AHIF-Oregon and AHIF-Saudi Arabia does not, by itself, establish OFAC's third reason.

At the time of AHIF-Oregon's designation and redesignation, OFAC had designated several separate AHIF entities, but it had not designated AHIF-Saudi Arabia or some of the additional AHIF branches that were designated later. OFAC argues that the various designated branches of the global AHIF organization formed a loose, mutually supportive network such that the designation of other branches substantiates the designation of AHIF-Oregon.

**[4]** In addition, OFAC directs us to evidence in the unclassified record of two events that occurred in 1999: AHIF-Oregon provided direct financial support to AHIF-Albania, allegedly to abet terrorist activities in Kosovo; and AHIF-Oregon funneled a large donation to AHIF-Saudi Arabia, allegedly to abet terrorist activities in Chechnya. Although AHIF-Oregon claims that the funds were meant to be used, and in fact were used, for humanitarian efforts and not terror-

ist activities, it does acknowledge the underlying facts of those financial transactions.

Of course, in 1999, there were no designated persons under EO 13,224 because the President did not issue that Order until 2001. As we just observed, though, in making a decision whether to designate, OFAC may consider the origin and history of an entity, at least when the historical ties have not been severed. *IARA-USA*, 477 F.3d at 734. And we note that, when OFAC designated AHIF-Oregon, it already had designated AHIF-Albania.

**[5]** In summary, the evidence in the unclassified record supports OFAC's contentions that AHIF-Oregon is a branch office of an international network of entities that, together, form the global AHIF organization and that AHIF-Oregon has ties to other branches, including at least one designated entity. As did the District of Columbia Circuit, "[w]e acknowledge that the unclassified record evidence is not overwhelming, but we reiterate that our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential." *Id.* Additionally, we have reviewed the classified record. In light of all the evidence in the record, we conclude confidently that substantial evidence supports OFAC's conclusion that AHIF-Oregon supported designated persons as a branch office of AHIF-Saudi Arabia. *See* EO 13,224 § 1(d)(i) (permitting designation of an entity that provides "financial, material, or technological support for, or financial or other services to or in support of," designated persons).

**[6]** Because substantial evidence supports two of OFAC's three reasons for redesignating AHIF-Oregon under EO 13,224, we affirm the district court's grant of summary judgment to OFAC on AHIF-Oregon's substantive claims.

B. *Procedural Due Process Challenges*

**[7]** AHIF-Oregon argues that OFAC violated its procedural due process rights by using classified information with-

out any disclosure of its content and by failing to provide adequate notice and a meaningful opportunity to respond. We apply the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See California ex rel. Lockyer v. Fed. Energy Regulatory Comm'n*, 329 F.3d 700, 709 n.8 (9th Cir. 2003) (explaining that, for procedural due process claims, the *Mathews* test is "a general test that applies in all but a few contexts"); *Nat'l Council of Resistance of Iran v. Dep't of State (NCORI)*, 251 F.3d 192, 208-09 (D.C. Cir. 2001) (applying the *Mathews* test in a similar context); *Am.-Arab Anti-Discrimination Comm. v. Reno (ADC)*, 70 F.3d 1045, 1061 (9th Cir. 1995) (same); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 528-29 (2004) (plurality) (holding that the proper test for balancing national security interests with a person's due process rights is the *Mathews* balancing test). Under the *Mathews* balancing test, we "must weigh (1) [the person's or entity's] private property interest, (2) the risk of an erroneous deprivation of such interest through the procedures used, as well as the value of additional safeguards, and (3) the Government's interest in maintaining its procedures, including the burdens of additional procedural requirements." *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 589 (9th Cir. 1998) (citing *Mathews*, 424 U.S. at 334-35).

[8] There are strong interests on both sides of the scale, generally encapsulated in the first and third *Mathews* factors. The private party's property interest is significant. By design, a designation by OFAC completely shutters all domestic operations of an entity. All assets are frozen. No person or organization may conduct any business whatsoever with the entity, other than a very narrow category of actions such as legal defense. Civil penalties attach even for unwitting violations. 50 U.S.C. § 1705(b). Criminal penalties, including up to 20 years' imprisonment, attach for willful violations. *Id.* § 1705(c). For domestic organizations such as AHIF-Oregon, a designation means that it conducts no business at all. The designation is indefinite. Although an entity can seek administrative reconsideration and limited judicial relief, those rem-

edies take considerable time, as evidenced by OFAC's long administrative delay in this case and the ordinary delays inherent in our judicial system. In sum, designation is not a mere inconvenience or burden on certain property interests; designation indefinitely renders a domestic organization financially defunct.

On the other side of the scale, the government's interest in national security cannot be understated. We owe unique deference to the executive branch's determination that we face "an unusual and extraordinary threat to the national security" of the United States. EO 13,224 pmbl. It is beyond dispute that "the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724 (2010).

Striking a balance between those two strong competing interests cannot be done in the abstract. As the *Mathews* balancing test makes clear, we must carefully assess the precise "procedures used" by the government, "the value of additional safeguards," and "the burdens of additional procedural requirements." *Foss*, 161 F.3d at 589 (citing *Mathews*, 424 U.S. at 334-35). As explained in more detail below, the Constitution certainly does not require that the government take actions that would endanger national security; nor does it require the government to undertake every possible effort to mitigate the risk of erroneous deprivation and the potential harm to the private party. But the Constitution does require that the government take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests.

### 1.   *OFAC's Use of Classified Information*

AHIF-Oregon argues that OFAC's use of classified information violates its procedural due process rights. The first two *Mathews* factors support AHIF-Oregon's position. As noted

above, its private interests are significant. And, as we have held previously with respect to the use of classified information without disclosure: "One would be hard pressed to design a procedure more likely to result in erroneous deprivations." *ADC*, 70 F.3d at 1069 (internal quotation marks omitted). "[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *Id.* But the third *Mathews* factor —the government's interest in maintaining national security —supports OFAC's position.

**[9]** Given the extreme importance of maintaining national security, we cannot accept AHIF-Oregon's most sweeping argument—that OFAC is not entitled to use classified information in making its designation determination. *See generally Gen. Dynamics Corp. v. United States*, 131 S. Ct. 1900, 1905 (2011) ("[P]rotecting our national security sometimes requires keeping information about our military, intelligence, and diplomatic efforts secret."). In AHIF-Oregon's view, if classified information concerning national security demonstrates that an entity is supporting terrorism, OFAC either must decline to designate the entity or must reveal the classified information to the entity that OFAC believes supports terrorist activities. Common sense dictates that AHIF-Oregon is overreaching. Not surprisingly, all federal courts to have considered this argument have rejected it. *Holy Land*, 333 F.3d at 164; *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner (KindHearts II)*, 710 F. Supp. 2d 637, 660 (N.D. Ohio 2010)*; Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 72 (D.D.C. 2008); *see also NCORI*, 251 F.3d at 208 (holding that, in a designation of a "foreign terrorist organization" under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the government's use of classified information without permitting the organization to view the information did not violate the organization's due process rights); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1241-43 (D.C. Cir. 2003) (following *NCORI* and

describing in detail its holding on this point); *United States v. Ott*, 827 F.2d 473, 477 (9th Cir. 1987) (holding that, in a military criminal trial, the government's use of classified information, without permitting the defendant or his lawyers to view the information, did not violate the defendant's due process rights); *cf. Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070 (9th Cir. 2010) (en banc) (affirming the district court's dismissal of an action because of the state secrets doctrine in a case involving classified information), *cert. denied*, 131 S. Ct. 2442 (2011); *IARA-USA*, 477 F.3d 728 (rejecting a challenge that the agency failed to comply with its regulation, 28 C.F.R. § 17.17(a)(1), which required the agency to determine which portions of the classified record "can be declassified").

The only case that could be read to yield the contrary conclusion is our decision in *ADC*, 70 F.3d 1045. There, the government used classified information in summary proceedings to exclude certain long-time resident aliens. *Id.* at 1052-54. The aliens brought suit, alleging that the use of classified information violated their due process rights. *Id.* at 1054. The district court, after viewing the classified information ex parte and in camera, agreed. *Id.*

Applying the *Mathews* balancing test, we affirmed. *ADC*, 70 F.3d at 1068-70. We found that the first two factors strongly favored the plaintiffs. And, under the facts of that case, we held that the government's claims of national security were "insufficient to tip the *Mathews* scale towards the Government." *Id.* at 1070. We reached that conclusion because of *the content of the classified information*. Specifically, the government had argued that the aliens threatened national security, but the classified information contained nothing about the aliens themselves; the classified information demonstrated only that the aliens were nominal members of a foreign organization that had engaged in terrorist activities. *Id.* at 1069-70. Notably, we stated that "[t]hese aliens have been free since the beginning of this litigation almost eight years ago, without criminal charges being brought

against them for their activities. . . . [The classified evidence] does not indicate that either alien has personally advocated those [impermissible] doctrines or has participated in terrorist activities." *Id.* at 1070. We concluded that the use of classified information "should be presumptively unconstitutional. Only the most extraordinary circumstances could support one-sided process." *Id.* Because extraordinary circumstances did not exist in that case, the use of the classified information was impermissible. *Id.*

[10] AHIF-Oregon argues that *ADC* is directly on point and "controls here." AHIF-Oregon is mistaken. We did not hold that classified information can never be used. Instead, we held that such use is "presumptively unconstitutional" subject to the government's overcoming the presumption in "the most extraordinary circumstances." *Id.* Even assuming that the standard enunciated in *ADC* remains good law,[8] the use of classified information in the fight against terrorism, during a presidentially declared "national emergency," qualifies as sufficiently "extraordinary" to overcome the presumption.[9] *See*

---

[8]We express some hesitation about the continuing vitality of *ADC*, especially in light of its premise that "a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions." 70 F.3d at 1069 (internal quotation marks omitted). As we recently explained at great length sitting en banc, that premise does not hold, at least in some contexts. *Jeppesen Dataplan*, 614 F.3d at 1077 ("One [form of the state secrets doctrine] completely bars adjudication of claims premised on state secrets . . . ; the other is an evidentiary privilege . . . that excludes privileged evidence from the case and may result in dismissal of the claims." (emphasis omitted)); *cf. Gen. Dynamics*, 131 S. Ct. at 1905 ("[P]rotecting our national security sometimes requires keeping information about our military, intelligence, and diplomatic efforts secret."). Because we distinguish ADC, we need not decide whether *ADC* remains valid precedent. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) (explaining when a three-judge panel may conclude that an earlier precedent has been fatally undermined).

[9]Additionally, our determination in *ADC* that the government could not use the classified information depended on the content of the classified information itself, which the district court had viewed in camera and ex

EO 13,224 pmbl. ("[The] September 11, 2001, acts . . . constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States . . . ."). In sum, we join all other courts to have addressed the issue in holding that, subject to the limitations discussed below, the government may use classified information, without disclosure, when making designation determinations.

AHIF-Oregon's more nuanced argument, however, presents a different question. AHIF-Oregon argues that, even if OFAC may use classified information, it must undertake some reasonable measure to mitigate the potential unfairness to AHIF-Oregon. AHIF-Oregon proffers that OFAC could, for example, provide an unclassified summary of the classified information or permit AHIF-Oregon's lawyer to view the documents after receiving a security clearance and pursuant to a protective order. In essence, AHIF-Oregon argues that, to the extent possible, OFAC must take reasonable measures that do not implicate national security and impose only a small burden on the agency.

**[11]** Under the *Mathews* test, we must consider "the value of additional safeguards" against the risk of error and "the burdens of additional procedural requirements." *Foss*, 161 F.3d at 589. The value of AHIF-Oregon's suggested methods seems clear. Without disclosure of classified information, the designated entity cannot possibly know how to respond to OFAC's concerns. Without knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations. To the extent that an

---

parte. It is clear from our analysis in *ADC* that, had the classified information demonstrated that the plaintiff-aliens had, in fact, engaged in terrorism, then the government's reliance on the information would have been permissible. In other words, our decision appears to have agreed with the premise that the government may use classified information without disclosure, if that information *truly* implicates national security. Here, the classified information implicates national security.

unclassified summary could provide helpful information, such as the subject matter of the agency's concerns, and to the extent that it is feasible to permit a lawyer with security clearance to view the classified information, the value of those methods seems undeniable. Indeed, the benefits from such disclosure could flow not only to the designated entity, which may be able to clear up errors, but also to OFAC, which may benefit from the resulting information provided by the designated entity.

We find significant that there may be means of providing information to the potential designee that do not implicate national security. For example, an unclassified summary, by definition, does not implicate national security because it is unclassified. Similarly, a lawyer for the designated entity who has the appropriate security clearance also does not implicate national security when viewing the classified material because, by definition, he or she has the appropriate security clearance.[10]

[12] We recognize that disclosure may not always be possible. For example, an unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security. Depending on the circumstances, OFAC might have a legitimate interest in shielding the materials even from someone with the appropriate security clearance. *See Ott*, 827 F.2d at 477 (holding, in a different context, that "Congress

---

[10]We recognize that the utility of the methods described in text may be limited. For example, the information conveyed by an unclassified summary will be decidedly less helpful to the entity than the classified information itself. But limited utility is very different from no utility. An unclassified summary is analogous to privilege logs in the context of discovery disputes, yet their use is routine. *See* Fed. R. Civ. P. 26(b)(5); *see also MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986) (holding that, on a motion for attorney fees, the requesting party must disclose its time sheets to the other party, redacted as necessary where protected by the attorney-client privilege).

has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to *anyone* not involved in the surveillance operation in question, whether or not she happens for unrelated reasons to enjoy security clearance"); *see also Gen. Dynamics*, 131 S. Ct. at 1904 (noting that disclosure of sensitive information to a limited number of lawyers led to "unauthorized disclosure of military secrets"). In many cases, though, some information could be summarized or presented to a lawyer with a security clearance without implicating national security.

Indeed, OFAC has not defended its failure to provide an unclassified summary or access by a lawyer with the proper security clearance on the ground that any such measure would have implicated national security. Instead, OFAC asserts that any mechanism would be unduly burdensome. OFAC points to the large number of designated persons and argues that any of the proposed measures could overwhelm the agency, diminishing its ability to carry out its important mission of protecting national security.

We acknowledge the agency's abstract concerns but find that they have little practical reality. Here, for instance, OFAC eventually presented a list of unclassified reasons to AHIF-Oregon, which could have been augmented by a short unclassified summary of classified evidence. The small expenditure in time and resources would not outweigh the entity's interest in knowing the charges and evidence against it. In fact, OFAC has provided just such a summary in a different case. *See KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner (KindHearts I)*, 647 F. Supp. 2d 857, 868 (N.D. Ohio 2009) (noting that OFAC had provided "an unclassified three-page summary of the classified evidence" to the entity under investigation).

**[13]** We understand from the parties that many (and likely most) of the designated persons are not United States citizens

or entities. That conclusion is unsurprising given that EO 13,224 primarily targets "foreign persons."[11] Many of those persons likely cannot assert the due process protections that are available to AHIF-Oregon, a United States entity. *See NCORI*, 251 F.3d at 201 (holding that "a foreign entity without property or presence in this country has no constitutional rights, under the Due Process Clause or otherwise" (internal quotation marks omitted)); *see also Aguilera-Montero v.* Mukasey, 548 F.3d 1248, 1253 (9th Cir. 2008) (discussing the "significant" "distinction" between those aliens who have entered the United States and those who have not: "Aliens standing on the threshold of entry are not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States." (internal quotation marks omitted)). So far as we can tell from the record in this case, very few designated persons respond to OFAC at all, let alone with requests for mitigation measures concerning classified information. In any event, if OFAC becomes inundated by mitigation requests in the future, the agency properly can raise that issue before the appropriate court. For purposes of *this* case, we hold that the small burden on the agency of providing mitigation measures does not outweigh the potential value to AHIF-Oregon. OFAC's failure to pursue potential mitigation measures violated AHIF-Oregon's due process rights.

[14] We note that we are not the first court to reach this conclusion. In *KindHearts II*, 710 F. Supp. 2d at 657-60, the district court surveyed the sparse case law on this topic and, having viewed the material in camera, concluded that, in the circumstances of that case, the government must "expeditiously declassify and/or summarize" its classified information and that, "[i]f declassification or summarization of

---

[11]*Compare* EO 13,224, § 1(a), (b) (blocking the assets of "foreign persons listed in the Annex" and "foreign persons" listed in the future that meet certain requirements), with *id.* § 1(c), (d) (blocking the assets of "persons" listed in the future, provided that certain other, more onerous requirements are met).

classified information is insufficient or impossible," the government must permit a lawyer for the plaintiff to view the classified information under a protective order. We agree that a case-by-case approach is proper. As we have alluded to earlier, the proper measures in any given case will depend on a number of factors. We expect the agency (and, if necessary, the district court) to consider, at a minimum, the nature and extent of the classified information, the nature and extent of the threat to national security, and the possible avenues available to allow the designated person to respond more effectively to the charges.

2.  *Adequate Notice and Meaningful Opportunity to Respond*

AHIF-Oregon argues that OFAC violated its due process rights by failing to provide adequate notice and a meaningful opportunity to respond to OFAC's designation and redesignation determinations. Specifically, AHIF-Oregon asserts that OFAC refused to disclose its reasons for investigating and designating AHIF-Oregon, leaving AHIF-Oregon unable to respond adequately to the agency's unknown suspicions.

"Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1378 (2010) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). " 'Due process is flexible and calls for such procedural protections as the particular situation demands.' " *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (brackets omitted) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Once again, the *Mathews* balancing test applies. *Foss*, 161 F.3d at 589.

At the outset, we note that AHIF-Oregon wisely does not challenge OFAC's decision not to provide *pre-deprivation* notice. As the district court noted, and as many courts have

held, the potential for "asset flight" almost certainly justifies OFAC's decision not to provide notice before freezing the assets. *See Holy Land*, 333 F.3d at 163-64; *Global Relief*, 315 F.3d at 754. Instead, AHIF-Oregon challenges the alleged failure to provide adequate notice and a meaningful opportunity to respond during the four-year period between the freezing of the assets in February 2004 and the redesignation determination in February 2008.[12]

In the first seven months, OFAC gave AHIF-Oregon no statement of reasons. OFAC did provide some unclassified documents to AHIF-Oregon and requested that AHIF-Oregon provide a copy of a Koran. But OFAC neither explained the relevance of the documents nor provided a statement of reasons for its investigation. After receiving the documents and request for a copy of a Koran, AHIF-Oregon took a guess at what reasons OFAC might possibly have had in mind. Some of those guesses ended up being correct (the $150,000 check to Chechens), and some of those guesses ended up being incorrect (distribution of Korans). In the entire four-year period, only one document could be viewed as supplying some reasons for OFAC's investigation and designation decision. Seven months after blocking AHIF-Oregon's assets, OFAC issued a press release that explained some of OFAC's reasons for the designation.[13] In particular, the press release

---

[12]Notice and a meaningful opportunity to respond are, in many circumstances, two different inquiries. Here, however, they are two sides of the same coin. No one disputes that OFAC permitted AHIF-Oregon the opportunity to submit evidence and arguments during the pendency of OFAC's determinations. The dispute concerns whether OFAC adequately apprised AHIF-Oregon of its reasons for considering designation and redesignation. If there was inadequate notice, then there was an inadequate opportunity to respond. But if there was adequate notice, then there was an adequate opportunity to respond. Although they are both implicated, we refer in text generally to adequate *notice* because, in the circumstances here, the two inquiries collapse.

[13]OFAC also sent a letter to AHIF-Oregon one week after the 2004 press release. But that letter contains no statement of reasons. The letter states that OFAC had designated AHIF-Oregon pursuant to EO 13,224, § 1(c), (d); those provisions contain *all* the general reasons for which an entity such as AHIF-Oregon may be designated.

stated that AHIF-Oregon had provided support to Chechen terrorists and attempted to conceal that activity.

**[15]** We hold that all three *Mathews* factors support the conclusion that OFAC violated AHIF-Oregon's due process rights. First, OFAC's blocking notice deprived AHIF-Oregon of its ability to use any funds whatsoever, for any purpose. Second, because AHIF-Oregon could only *guess* (partly incorrectly) as to the reasons for the investigation, the risk of erroneous deprivation was high. Finally, and perhaps most importantly, although national security might justify keeping AHIF-Oregon in the dark, OFAC makes no effort to demonstrate that its failure to provide AHIF-Oregon with reasons for its investigation promoted national security. OFAC presents three different arguments to justify its failure to provide a statement of reasons.

First, OFAC argues that its September 2004 press release constituted sufficient notice. We agree with OFAC that the press release states with some clarity that AHIF-Oregon supported Chechen terrorists (the third reason given in the 2008 redesignation notice). OFAC also claims that there was sufficient information in the press release to apprise AHIF-Oregon of OFAC's concern about control by Al-Aqil and Al-Buthe (the first and second reasons given in the 2008 redesignation notice). But, as the district court correctly pointed out, the press release stated nothing about ownership or control of AHIF-Oregon. OFAC provided notice concerning only one of three reasons for its investigation and designation, and that notice occurred seven months after it froze AHIF-Oregon's assets. Such a significantly untimely and incomplete notice does not meet the requirements of due process.

Second, OFAC argues that it was impractical to provide reasons to AHIF-Oregon during the four-year investigation. We are unpersuaded for many of the same reasons, just discussed, concerning OFAC's failure to provide mitigation measures regarding the classified information. It is clear that

OFAC *had* its reasons for investigating AHIF-Oregon (otherwise its investigation would be unjustified), so the summary of those reasons would not present a practical burden. Moreover, as discussed above, it appears that very few of the entities under investigation request a statement of reasons or are even entitled to the protections of the Due Process Clause.

We can envision situations in which OFAC acts so quickly between the original deprivation and its decision to designate that it may be impractical to provide a statement of reasons. But the seven-month period of the original investigation, and certainly the four-year period of the entire redesignation determination, gave OFAC ample time to provide AHIF-Oregon with, at a minimum, a terse and complete statement of reasons for the investigation. There is no reason why OFAC could not have given notice in this particular case.[14] If a notice requirement is unduly burdensome in some future case, OFAC may present that argument to the appropriate court.

Finally, OFAC argues that the circumstances of its investigation and the documentation that it submitted to AHIF-Oregon provided that entity with sufficient information from which AHIF-Oregon could *guess* OFAC's reasons. In any event, OFAC asserts, AHIF-Oregon's guesses proved partly correct. We have rejected that argument in an analogous situation; the opportunity to guess at the factual and legal bases for a government action does not substitute for actual notice of the government's intentions.

In *Gete v. INS*, 121 F.3d 1285, 1287-91 (9th Cir. 1997), the INS seized motor vehicles from certain aliens and offered

---

[14]Indeed, at oral argument, counsel for OFAC disavowed the argument that OFAC could not have given timely notice to AHIF-Oregon in this particular case. *See* Oral Arg. Transcript at 44:20 (Counsel for OFAC: "Your Honor, I am not arguing—my argument today is not that [OFAC] could not have noticed [AHIF-Oregon]. That is not the argument.").

only summary process of the aliens' requests to recover those vehicles. The INS argued, similarly to OFAC here, that nothing required additional process and, in any event, the motor vehicle "owners will frequently have at least a general idea of the factual basis for the seizure." *Id.* at 1297. We disagreed and held that the Due Process Clause required the INS "to give sufficient notice concerning the factual and legal bases for its seizures." *Id.* With respect to the argument that the owners likely could guess as to the reasons, we held that, "without knowing the exact reasons for the seizure, as well as the particular statutory provisions and regulations they are accused of having violated, [the owners] may not be able to clear up simple misunderstandings or rebut erroneous inferences drawn by the INS." *Id.* We held that the Due Process Clause required the INS to disclose the "factual bases for seizure[ ]" and "the specific statutory provision allegedly violated." *Id.* at 1298.

**[16]** Although our decision in *Gete* arose in a different context, OFAC has not attempted to explain why the different context matters. We find *Gete*'s reasoning equally applicable here: In the absence of national security concerns, due process requires OFAC to present the entity with, at a minimum, a timely statement of reasons for the investigation.

Our conclusion also is supported by the analysis of the district court in *KindHearts I*, 647 F. Supp. 2d at 901-08. In that case, the district court found a due process violation in the identical context (designation by OFAC under EO 13,224 of a non-profit organization) with startlingly similar facts. OFAC blocked the entity's assets but gave no statement of reasons until "approximately thirty-four months after the block pending investigation, and approximately eighteen months after its provisional determination to designate." *Id.* at 903. The court held that the notice was constitutionally inadequate and failed to provide a meaningful opportunity to respond. *Id.* at 904-08; *see id.* at 901 ("Constitutionally sufficient notice should give

the party an understanding of the allegations against it so that it has the opportunity to make a meaningful response.").

OFAC leans heavily on two decisions by the District of Columbia Circuit. In *NCORI*, 251 F.3d at 208-09, the court addressed what process is due in the closely similar context of designation of a foreign terrorist organization under AEDPA. In that case, the government had provided no notice at all and no opportunity for the entity to be heard. *Id.* at 208. The court held that due process requires notice of pending designation, a copy of the unclassified administrative record, and an opportunity to respond. *Id.* at 208-09. That court did not address the issue at hand here: whether the notice must contain some statement of reasons for the investigation. Thus the court did not state that the government must supply its reasons for investigating.

Similarly, in *Holy Land*, 333 F.3d at 164, the District of Columbia Circuit addressed a challenge to OFAC's designation under EO 13,224, including the argument that OFAC provided insufficient process. Applying *NCORI*, the court rejected the due process argument:

> Treasury notified both Holy Land ["HLF"] and the district court that it was reopening the administrative record and considering whether to redesignate HLF as an SDGT [specially designated global terrorist], on the basis of additional evidence linking HLF and Hamas. Holy Land was then given thirty-one days to respond to the redesignation and the new evidence. Holy Land did respond and the Treasury considered its response as well as the new evidence before deciding to redesignate HLF in May 2002. Therefore, Treasury provided HLF with the requisite notice and opportunity for response necessary to satisfy due process requirements.

*Id.*

Both decisions by the District of Columbia Circuit may suggest that a statement of reasons is not required by due process, because neither decision mentions that issue. But it appears that the plaintiffs in those cases never raised that specific issue and that the notice given in *Holy Land* sufficiently stated the reasons for the investigation. We do not read those decisions as holding definitively that due process does not require a statement of reasons. In any event, to the extent that the District of Columbia Circuit decisions are in tension with our decision in *Gete*, we are bound to follow our decision. *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). We hold that OFAC violated AHIF-Oregon's due process rights by failing to provide an adequate statement of reasons for its investigation.

3.  *Harmlessness of the Procedural Due Process Violations*

[17] Although OFAC violated AHIF-Oregon's procedural due process rights, we may grant judicial relief only if the errors were prejudicial. OFAC argues that, to the extent that it violated AHIF-Oregon's due process rights, any error was harmless and no prejudice ensued. AHIF-Oregon responds that the violations at issue here are "structural" and not subject to harmlessness analysis. AHIF-Oregon argues, in the alternative, that the errors were not harmless.

We disagree with AHIF-Oregon that the procedural due process violations at issue here are "structural errors" that per se undermine the proceedings. The Supreme Court has never held that an error in the *civil* context is structural.[15] *M.L. v.*

---

[15]AHIF-Oregon asserts that "the Supreme Court appears to have" applied structural error in *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252 (2009). In *Caperton*, the Court held that a justice of the West Virginia Supreme Court violated due process by failing to recuse himself from a case in which one party was an "extraordinary" donor to the justice's reelection campaign. The Court remanded "for further proceedings not inconsistent with [its] opinion." *Id.* at 2267. Given the Court's silence on the issue of harmlessness and its open-ended remand, we decline to read that case as a landmark case—the first of its kind according to AHIF-Oregon—concerning an issue that the Court failed even to mention.

*Fed. Way Sch. Dist.*, 394 F.3d 634, 654 (9th Cir. 2005) (Gould, J., concurring). And even in the criminal context, the Supreme Court "ha[s] found an error to be structural, and thus subject to automatic reversal, only in a very limited class of cases." *Neder v. United States*, 527 U.S. 1, 8 (1999) (internal quotation marks omitted).

**[18]** AHIF-Oregon likens its situation to that of a criminal defendant who is convicted of a charge not included in the indictment. *See Stirone v. United States*, 361 U.S. 212, 219 (1960) ("Here, . . . we cannot know whether the grand jury would have included in its indictment [the additional] charge . . . . This was fatal error."). But there are significant differences between criminal and civil proceedings, even here, where the deprivation of property is great. We do not hold that an error in a civil context can never be structural, but we do hold that the errors here—failure to mitigate the use of classified information and failure to provide sufficiently detailed notice—do not undermine the proceedings so fundamentally that we cannot ask whether the error was harmless. *See KindHearts II*, 710 F. Supp. 2d at 654 (holding that, at least with respect to the constitutionally inadequate notice in that case, the errors were not structural).

Turning to the harmless-error analysis, we face another threshold question: the burden of proof. Quoting *Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291, 303 (2007), the district court held that OFAC bore the burden of demonstrating that the procedural due process violations were "harmless beyond a reasonable doubt." Although the district court's reliance on *Brentwood Academy* is understandable, we hold that the district court erred. In that case, the Supreme Court stated, without elaboration on the proper standard, that "[e]ven accepting the questionable holding that [the agency's] closed-door deliberations were unconstitutional, we can safely conclude that any due process violation was harmless beyond a reasonable doubt." *Id.*

We do not read the Court's statement as resolving the proper standard of proof in the civil context. Because the Supreme Court in *Brentwood Academy* did not explain its choice of the "reasonable doubt" standard and did not cite any cases supporting the use of that standard, we read its use of the demanding "beyond a reasonable doubt" standard simply as illustrating how clear it was that the purported error in that case was harmless.

Just two years later, the Court addressed that specific issue and clarified that "we have placed such a burden [to prove harmlessness] on the appellee only when the matter underlying review was criminal." *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009). Because this is not a criminal case, AHIF-Oregon has the burden of proving that the error was harmful. *See id.* ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (collecting cases)); *see also id.* at 1705 (noting the potential for "abuse of the judicial process and diminish[-ment] [of] the public's confidence in the fair and effective operation of the judicial system" where the courts set "an evidentiary barrier so high that it could never be surmounted . . . , namely, reversing for error regardless of its effect on the judgment" (internal quotation marks omitted)); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011) ("Certainly, *Sanders* clarifies that the burden of showing an agency's deviation from the APA was not harmless rests with the petitioner . . . ."); *cf. Lata v. INS*, 204 F.3d 1241, 1246 (9th Cir. 2000) ("To prevail on a due process challenge to deportation proceedings, [the alien] must show error and substantial prejudice. A showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings; we will not simply presume prejudice." (citations omitted)).

AHIF-Oregon must establish that, had it been provided the process it was due, it could have, and plausibly would have, taken steps to undermine OFAC's 2008 redesignation such

that OFAC would not have made the redesignation or that substantial evidence would not have supported the redesignation.[16] In Part A, we held that substantial evidence supports two of the three reasons given by OFAC: ownership or control by Al-Buthe and AHIF-Oregon's support of designated entities and persons. As we explain below, AHIF-Oregon could not have undermined OFAC's conclusion that AHIF-Oregon supported designated persons. Accordingly, we need not determine whether AHIF-Oregon could have undermined OFAC's conclusion that Al-Buthe's control supported its designation determination.

[19] Initially, we note that, as discussed in Part B-2, OFAC *did* provide some notice to AHIF-Oregon of its concerns related to AHIF-Oregon's support of designated persons as a branch office of AHIF-Saudi Arabia. Among other things, AHIF-Oregon had notice about the $150,000 check to the Chechens, so it had a full opportunity to respond to that allegation. Its failure to alleviate OFAC's concerns, even with some notice, suggests that additional information would not have made a difference. Additionally, there is little that AHIF-Oregon could have done about the history and genesis of its organization, including its connections to the larger AHIF organization. Viewing the record as a whole, including the classified information, we conclude that the procedural due process violations related to AHIF-Oregon's support of

---

[16]Under our jurisprudence, in certain contexts, an error that had a "bearing on the procedure used" is not harmless. *Cal. Wilderness Coal.*, 631 F.3d at 1092 (internal quotation marks omitted); *but see id.* at 1109-10 (Ikuta, J., dissenting) (arguing that our rule has been superseded by *Sanders*). As we recently explained, that rule does not apply where "[t]he notice requirement was not an end in itself." *Id.* at 1092 (majority). "If a failure of notice had no effect on the [final substantive] determination . . . , there could be no harm; the failure of notice by itself was of no consequence." *Id.* Here, we hold that notice is not "an end in itself." Notice provides fairness to the designated entity and facilitates full disclosure of information. But, where OFAC would have arrived at the same determination even with adequate notice, any error is harmless.

designated persons were harmless. Even if AHIF-Oregon had enjoyed better access to classified information and constitutionally adequate notice, we are confident that it would not have changed OFAC's ultimate designation determination. We therefore affirm the district court's dismissal of the due process claims.

## C.   *Fourth Amendment*

AHIF-Oregon argues that OFAC's failure to obtain a warrant supported by probable cause violated its Fourth Amendment right to be free of unreasonable seizures. "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). In most circumstances, searches and seizures conducted without a warrant are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Here, OFAC argues that its seizure falls within one of those well-delineated exceptions to the warrant requirement: the "special needs" exception.

### 1.   *"Special Needs" Exception*

[20] "The 'special needs' exception is 'an exception to the general rule that a search [or seizure] must be based on individualized suspicion of wrongdoing.' " *Friedman v. Boucher*, 580 F.3d 847, 853 (9th Cir. 2009) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 54 (2000)). "Under this exception, suspicionless searches [and seizures] may be upheld if they are conducted for important non-law enforcement purposes in contexts where adherence to the warrant-and-probable cause requirement would be impracticable." *Id.* (internal quotation marks and emphasis omitted); *see also*

*Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) ("[W]e have permitted exceptions when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." (internal quotation marks omitted)). AHIF-Oregon concedes that OFAC blocking orders are "conducted for important non-law enforcement purposes," specifically, to prevent the funding of terrorist organizations. But the parties dispute whether the application of the warrant requirement would be impracticable.

The Supreme Court has held that the "special needs" exception applies in several different contexts. The exception requires a weighing of the nature and extent of the privacy interest at hand against the nature and immediacy of the government's concerns and the efficacy of the procedures employed in meeting those concerns. *Bd. of Educ. v. Earls*, 536 U.S. 822, 830-34 (2002). Because those interests vary with the factual context, a brief survey of the major cases is helpful.

In *Camara v. Municipal Court*, 387 U.S. 523 (1967), the Court held that periodic, routine building inspections for health code reasons fell within the exception. The Court explained that (1) "such programs have a long history of judicial and public acceptance"; (2) "the public interest demands that all dangerous conditions be prevented or abated, yet it is doubtful that any other canvassing technique would achieve acceptable results"; and (3) the searches "involve a relatively limited invasion of the urban citizen's privacy." *Id.* at 537.

In *O'Connor v. Ortega*, 480 U.S. 709 (1987), the Court held that a government employer may search the files and drawers of its employees for work-related reasons. The Court held that "requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome." *Id.* at 722 (plurality); *see also id.* at 732 (Scalia, J.,

concurring) (agreeing with the plurality's "special needs" conclusion). Additionally, "the privacy interests of government employees in their place of work . . . , while not insubstantial, are far less than those found at home or in some other contexts." *Id.* at 725 (plurality); *see also Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665-67 (1989) (holding that drug testing of Customs employees falls within the "special needs" exception for similar reasons).

In *Earls*, 536 U.S. at 825, the Court held that a public school's policy of requiring drug testing of all students participating in extracurricular activities fell within the "special needs" exception. "A student's privacy interest is limited in a public school environment . . . ." *Id.* at 830. Because the school conducted the test with many procedural safeguards and used the results only in connection with permitting the student to participate in extracurricular activities, the Court held that, "[g]iven the minimally intrusive nature of the sample collection and the limited uses to which the test results are put, we conclude that the invasion of students' privacy is not significant." *Id.* at 834. Finally, the Court considered the school's strong interest in "preventing drug use by schoolchildren," especially because of "specific evidence of drug use" at the school in question. *Id.*

In *Griffin*, 483 U.S. at 875-80, the Court held that a probation officer's search of a probationer's home on a tip by a police officer that the probationer illegally possessed a gun fell within the exception. The Court emphasized that "[p]robation is simply one point . . . on a continuum of possible punishments." *Id.* at 874. "A warrant requirement would interfere to an appreciable degree with the probation system," particularly because "the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct." *Id.* at 876. Moreover, "[a]lthough a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen. He . . . is also supposed

to have in mind the welfare of the probationer." *Id.* Overall, the Court concluded that "the probation regime would . . . be unduly disrupted" by requiring probable cause and a warrant. *Id.* at 878. "[I]t is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon [a showing of probable cause]." *Id.* at 879.

In *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), and *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Court held that traffic checkpoints where officers screened vehicles for intoxicated drivers or illegal aliens survived Fourth Amendment scrutiny. In both cases, the Court's decision resulted largely from the "minor interference" involved in responding to a traffic checkpoint. *Martinez-Fuerte*, 428 U.S. at 565; *see Sitz*, 496 U.S. at 451 (holding that the intrusion on motorists is "slight"); *see also New York v. Burger*, 482 U.S. 691, 702 (1987) (holding that "the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy" such that the Fourth Amendment warrant and probable-cause requirements "have lessened application in this context").

Finally, in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), the Court held that railroads may administer blood, urine, and breath tests for railroad employees who are involved in certain train accidents. The Court held that a warrant "would do little to further the[ ] aims" of the Fourth Amendment because, in the context of a regulatory scheme in which privacy intrusions "are defined narrowly and specifically in the regulations that authorize them, and doubtless are well known to covered employees," "there are virtually no facts for a neutral magistrate to evaluate." *Id.* at 622. The Court also noted that the value of the results of most of the tests would be greatly diminished, or even eliminated, by the delay that obtaining a warrant would cause. *Id.* at 623.

[21] Here, the domestic entity's interest in being free from blocking orders is great. A blocking order effectively shuts

down the private entity. Indeed, blocking orders do so *by design*. Unlike in the Court's other cases, such as a one-time drug test, a search of files at a person's office, a search of a home while on probation, or a brief traffic stop, there is no limited scope or scale to the effect of the blocking order. The only limit is temporal, and that limitation is quite small. Once OFAC concludes its investigation (which took more than half a year here), then the party has a right to very limited judicial review and a right to request administrative reconsideration. Both of those actions take considerable time, as the facts of this case and other cases, such as *KindHearts*, demonstrate. In the meantime, the entity's doors are closed.

**[22]** Additionally, OFAC's potential reach is extensive. Unlike the Court's cases, which concerned well-defined classes of persons such as probationers, public school students, public employees at work, drivers on the road, and so on, OFAC can issue a blocking order against *any person* within the United States or elsewhere. And, of course, OFAC does so without warning. There certainly is no "long history of judicial and public acceptance." *Camara*, 387 U.S. at 537. Relatedly, unlike in the school and probation cases, in which those persons who conduct the search or seizure also are entrusted with protecting the targeted person's interests, OFAC is not at all tasked with protecting the interests of the blocked entities.

**[23]** On the other side of the scale, the government's interest in preventing terrorism and the funding of terrorism is extremely high. But the sensitive subject matter is no excuse for the dispensing altogether with domestic persons' constitutional rights. *Cf. Hamdi*, 542 U.S. 507 (holding that due process required that a United States citizen being held as an "enemy combatant" be given a meaningful opportunity to contest his detention). Rather, the dispositive question here is whether it is impracticable for OFAC to achieve its undeniably important aims without securing a warrant.

On this point, OFAC asserts that it does not and cannot know the location of the assets it seeks to block and must rely on property holders other than the blocked entity to identify such assets. OFAC also asserts that it would be impractical to update its warrants whenever it discovered additional assets owned by the entity. Finally, OFAC asserts that the timing of its blocking orders is coordinated with other governments, which makes it impractical to obtain a warrant.

**[24]** We are not persuaded. As an initial matter, we reiterate that the number of designated persons located within the United States appears to be very small. The warrant requirement therefore will be relevant in only a few cases.

We acknowledge that the issue of "asset flight" is a legitimate concern; that coordination may be required with different agencies of this government or even with foreign governments; and that additional assets may be discovered in the future. To the extent that those concerns are present in any given situation, OFAC can protect its interest in stopping the funding of terrorism by seizing the assets *initially* pursuant to an emergency exception to the warrant requirement, *see United States v. Deemer*, 354 F.3d 1130, 1132 (9th Cir. 2004) (describing the emergency exception); or pursuant to a carefully circumscribed warrant, *cf. United States v. Tamura*, 694 F.2d 591, 595-96 (9th Cir. 1982) (permitting, in some instances involving intermingled documents, the seizure of many documents followed by the ability to seek a warrant for material not initially covered by a warrant). After OFAC has blocked the assets so that asset flight is foreclosed, OFAC then can obtain a warrant specifying the particular assets.

**[25]** In any event, OFAC has not given us any reason why it could not have obtained a warrant *here*. We hold that the "special needs" exception does not apply to the seizure of AHIF-Oregon's assets by OFAC under EO 13,224. *See Kind-Hearts II*, 647 F. Supp. 2d at 879-82 (holding that the "special needs" exception did not apply to very similar facts).

### 2.  *"General Reasonableness" Test*

OFAC also argues that, apart from any well-delineated exception to the warrant requirement, its blocking orders "are not susceptible to Fourth Amendment challenges" because they are per se reasonable under the "general reasonableness" test. " '[R]easonableness in all the circumstances of the particular governmental invasion of a citizen's personal security' " is the "touchstone" of Fourth Amendment analysis. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

Ordinarily, the reasonableness of governmental action is established by obtaining a warrant or by falling within one of the well-delineated exceptions to the warrant requirement. *Katz*, 389 U.S. at 357. OFAC has directed us to a few cases, however, in which the Supreme Court has analyzed whether a warrantless search was reasonable in the totality of the circumstances—without reference to any specific exception. *Samson v. California*, 547 U.S. 843 (2006); *United States v. Flores-Montano*, 541 U.S. 149 (2004); *United States v. Knights*, 534 U.S. 112 (2001). We will assume for the purpose of our discussion (but do not decide) that the " 'general Fourth Amendment approach,' " *Samson*, 547 U.S. at 848 (quoting *Knights*, 534 U.S. at 118), applies equally to warrantless seizures. *But see KindHearts I*, 647 F. Supp. 2d at 878-79 (holding that there is no general "reasonableness" approach to warrantless seizures).

Under this approach, "we examine the totality of the circumstances to determine whether a [seizure] is reasonable within the meaning of the Fourth Amendment." *Samson*, 547 U.S. at 848 (internal quotation marks and brackets omitted). "Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (internal quotation marks omitted).

Most of our reasoning above, concerning the special needs exception, applies equally here. The cases in which the Court has found warrantless searches to be reasonable all involve very special circumstances and greatly diminished privacy interests—a point repeatedly emphasized by the Court. For instance, in *Flores-Montano*, 541 U.S. at 154, the Court held that a person's privacy interest in the interior of an automobile's gas tank is not sufficient to overcome the government's interest in preventing drug smuggling at the border. Similarly, in *Samson* and *Knights*, the Court explained at length that probationers and parolees, who are subject to a clearly disclosed search condition of parole or probation, have greatly diminished expectations of privacy such that warrantless searches survived Fourth Amendment scrutiny. *Samson*, 547 U.S. at 850-52; *Knights*, 534 U.S. at 119-21. Here, however, as we have explained, the reach of OFAC's authority extends to *all persons and entities*, without limitation. Nothing diminishes the privacy expectation of persons and entities potentially subject to seizure by OFAC because that class includes everyone.

[26] We reiterate that OFAC's interest in preventing terrorism is extremely high. But we cannot accept OFAC's contention that its blocking orders are per se reasonable in all circumstances, solely by virtue of that vital mission. As we noted above, an exception to the warrant requirement would permit OFAC to seize assets without obtaining a warrant in some situations. But, because there is no diminished expectation of privacy and because nothing prevents OFAC from obtaining a warrant in the normal course, we reject OFAC's argument that its blocking orders are per se reasonable under the "general reasonableness" approach.[17]

---

[17]OFAC also mentions two district court decisions, *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 48 (D.D.C. 2005); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 78-79 (D.D.C. 2002). In both of those cases, the court held, with no analysis whatsoever, that a blocking order does not constitute a "seizure" for

**[27]** In summary, no exception applies to OFAC's warrantless seizure of AHIF-Oregon's assets and the seizure is not justified under a "general reasonableness" test. We therefore hold that OFAC violated AHIF-Oregon's Fourth Amendment right to be free of unreasonable seizures.[18] Because the district court did not reach the issue of remedy and because the parties did not brief that issue before us, we remand to the district court to determine, in the first instance, what remedy, if any, is available.

D.   *First Amendment*

Section 2(a) of EO 13,224 prohibits any person from making "any contribution of . . . services to or for the benefit of" designated entities. MCASO "seeks to engage in advocacy coordinated with and for the benefit of AHIF-Oregon." MCASO argues that the prohibition against its coordinated advocacy violates the First Amendment.

We are guided by the Supreme Court's decision in *Holder*

---

Fourth Amendment purposes. We do not find the unexplained conclusion persuasive. *See KindHearts II*, 647 F. Supp. 2d at 871-72 (explaining the errors of the other district court opinions and rejecting the argument that the seizure of assets under EO 13,224 is not a "seizure" for Fourth Amendment purposes).

[18]In its petition for rehearing, OFAC raises interesting arguments about issues that we need not, and do not, decide. We address only the facts of this case: OFAC's seizure of assets as a result of its designation order of a United States entity located within the United States. We do not address the requirements under the Fourth Amendment for other situations including, for example, designations of foreign entities or designations by executive order. We also make clear that our holding concerns OFAC's original designation order only; we do not address whether a warrant is required for subsequent orders. Finally, we note that a designation order need not specify all details of every asset to meet the Fourth Amendment's particularity requirement. *Cf. United States v. Petti*, 973 F.2d 1441, 1444-45 (9th Cir. 1992) (holding that a " 'roving' wiretap surveillance" warrant meets the Fourth Amendment's particularity requirement).

*v. Humanitarian Law Project ("HLP")*, 130 S. Ct. 2705 (2010). In that case, the government had designated certain entities as "foreign terrorist organizations" under AEDPA. *Id.* at 2713. Two United States citizens and six domestic organizations wished to provide aid to the peaceful portion of the designated entities' activities but feared prosecution under 18 U.S.C. §§ 2339A and 2339B. *HLP*, 130 S. Ct. at 2713-14. Those provisions criminalize the provision of any "service" or "material support" to AEDPA-designated entities. 18 U.S.C. § 2339A(b)(1); *id.* § 2339B(a)(1); *see also HLP*, 130 S. Ct. at 2715 (describing the relevant legislative history). The plaintiffs desired to provide certain specified services and to conduct coordinated advocacy with the AEDPA-designated entities. *HLP*, 130 S. Ct. at 2714. In a pre-enforcement action, the plaintiffs challenged the statute's application to those proposed activities. *Id.*

The Supreme Court rejected the plaintiffs' vagueness challenge to the term "service." *Id.* at 2721-22. The Court held that it was clear that the term "service" "refers to concerted activity, not independent advocacy." *Id.* at 2721. Accordingly, although the statute prohibits *coordinated* advocacy, the statute permits *independent* advocacy. *Id.* at 2722. The plaintiffs had posed many hypothetical questions about what constitutes coordinated advocacy, as opposed to independent advocacy. *Id.* But the Court held that those challenges were unripe in the context of a pre-enforcement challenge:

> The problem with these questions is that they are entirely hypothetical. Plaintiffs have not provided any specific articulation of the degree to which *they* seek to coordinate their advocacy with the [designated entities]. They have instead described the form of their intended advocacy only in the most general terms. See, *e.g.*, Brief for Plaintiffs 10-11 (plaintiffs "would like, among other things, to offer their services to advocate on behalf of the rights of the Kurdish people and [one entity] before the United Nations

and the United States Congress" (internal quotation marks and alteration omitted)); App. 59 (plaintiffs would like to "write and distribute publications supportive of [one entity] and the cause of Kurdish liberation" and "advocate for the freedom of political prisoners in Turkey").

Deciding whether activities described at such a level of generality would constitute prohibited "service[s]" under the statute would require sheer speculation—which means that plaintiffs cannot prevail in their preenforcement challenge. It is apparent with respect to these claims that gradations of fact or charge would make a difference as to criminal liability, and so adjudication of the reach and constitutionality of the statute must await a concrete fact situation.

*Id.* (alteration in original) (citation and some internal quotation marks omitted).

The Court next discussed the plaintiffs' as-applied challenge to the statute's ban on "material support." The Court rejected the government's argument that only intermediate scrutiny applied. *Id.* at 2723-24. The Court held that strict scrutiny applied because, at least on the facts of that case, the statute regulated speech because of its content. *Id.* The Court then turned to whether the statute's ban on material support was necessary to further the (concededly high) interest of combating terrorism. *Id.* at 2724.

The Court upheld the statute's constitutionality as applied to the plaintiffs' desired conduct. *Id.* at 2724-30. The Court first explained that, at least with respect to the activities desired by the plaintiffs, three rationales existed. *Id.* First, the Court held that "[m]oney is fungible." *Id.* at 2725. When a terrorist organization receives support for *any* end, even peaceful ends, it frees up the organization's funds for other,

sinister ends. *Id.* at 2725-26. In a footnote, the Court explained that this line of reasoning applies even if the support, such as the provision of non-financial material help, is not itself fungible. *Id.* at 2726 n.6. Second, the Court held that support "also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks." *Id.* at 2725. In response to the dissent's argument that there is no natural stopping place for the legitimacy concern, the Court responded that "Congress has settled on just such a natural stopping place: The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization." *Id.* at 2726. Third, the Court held that "[p]roviding foreign terrorist groups with material support in any form also furthers terrorism by straining the United States' relationships with its allies and undermining cooperative efforts between nations to prevent terrorist attacks." *Id.* The Court explained that the Republic of Turkey actively was at war with one of the entities and "would hardly be mollified by the explanation that the support was meant only to further those groups' 'legitimate' activities." *Id.*

The Court then "turn[ed] to the particular speech plaintiffs propose to undertake." *Id.* at 2729. The Court held that Congress permissibly could ban the plaintiffs' proposed training of the entities' members "on how to use humanitarian and international law to peacefully resolve disputes." *Id.* "It is wholly foreseeable that the [entity] could use the specific skills that plaintiffs propose to impart as part of a broader strategy to promote terrorism. The [entity] could, for example, pursue peaceful negotiation as a means of buying time to recover from short-term setbacks, lulling opponents into complacency, and ultimately preparing for renewed attacks." *Id.* (citation, internal quotation marks, and brackets omitted). The Court concluded that "[t]his possibility is real, not remote." *Id.*

The Court next held that Congress permissibly could ban the plaintiffs' proposal to teach entities' members "how to petition various representative bodies such as the United Nations for relief." *Id.* (internal quotation marks omitted). The Court held that the relief that the entities could seek might include monetary relief and, again noting that "[m]oney is fungible," the Court concluded that those funds "could be redirected to funding the group's violent activities." *Id.*

With respect to the plaintiffs' proposed coordinated advocacy, however, the Court again punted. *Id.* The Court held that, as it had explained earlier, the "plaintiffs do not specify their expected level of coordination" with the entities; their "proposals are phrased at such a high level of generality that they cannot prevail in this preenforcement challenge." *Id.*

In addition to not reaching the challenge concerning coordinated advocacy, the Court expressly limited its holdings to the particular facts of the case. *Id.* at 2729-30. Most relevant here, the Court stated that "[w]e . . . do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations." *Id.* at 2730; *see also id.* at 2712 ("We do not . . . address the resolution of more difficult cases that may arise under the statute in the future.").

[28] With that discussion in mind, we analyze the provision at issue here—section 2(a) of EO 13,224—and MCASO's proposed activities. Section 2(a) of EO 13,224 and the statutory provision at issue in *HLP* both prohibit the provision of "services" to an entity that has been designated, albeit under different statutory authorities, by the executive branch as a terrorist organization. For purposes of the First Amendment analysis, we see no difference between section 2(a) of EO 13,224 and the statute at issue in *HLP*. Accordingly, as both parties suggest, we must apply the Supreme Court's decision in *HLP*. Two immediate results follow.

First, as OFAC readily concedes, MCASO is free to conduct a practically limitless range of *independent* activities to

express its view that AHIF-Oregon should not be designated. On that topic, it may petition the government or the United Nations, hold press conferences, lobby the public, purchase advertisements, conduct demonstrations, organize an educational conference, and so on. It is only *coordinated* activities —those activities done, for instance, on behalf of AHIF-Oregon or in coordination with AHIF-Oregon—that EO 13,224 prohibits.

Second, we must apply strict scrutiny to EO 13,224's prohibition. *HLP*, 130 S. Ct. at 2724. Accordingly, the prohibition survives only if it is narrowly tailored to advance the concededly compelling government interest of preventing terrorism. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004). Regulations subject to strict scrutiny "almost always violate the First Amendment." *Dish Network Corp. v. FCC*, No. 10-16666, 2011 WL 3449485, at *5 (9th Cir. Aug. 9, 2011). But not always, as *HLP* instructs. We turn, then, to the facts of this case.

Although both this case and *HLP* involve the proposed provision of services to a designated entity, the facts of this case differ from *HLP*'s in two significant ways. First, in *HLP*, the plaintiffs proposed to conduct "coordinated advocacy" with the designated entities, but only in the most general terms. Because the plaintiffs had failed to specify what activities it would conduct, the Court held that the pre-enforcement challenge could not proceed.

Here, however, MCASO has specified in some detail the activities in which it wishes to engage. In particular, MCASO avers in the complaint that, in coordination with AHIF-Oregon and on its behalf, it desires to "speak[ ] to the press, hold[ ] demonstrations, and contact[ ] the government." In its brief before us, MCASO explains that it would like to "organiz[e] public education activities in conjunction with AHIF-Oregon." At oral argument, MCASO's lawyer said that the

organization would like to issue a "coordinated press release" and to conduct a "coordinated press conference."[19]

OFAC does not assert that these proposed activities are so general as to preclude pre-enforcement challenge. We agree. Like the proposed training activities reviewed by the Supreme Court in *HLP*, 130 S. Ct. at 2729, MCASO's proposed activities here are specific enough that we may review the First Amendment challenges in this pre-enforcement action.

The second significant difference between this case and *HLP* is the nature of the designated entity. The entities in *HLP* were wholly foreign, whereas AHIF-Oregon is, at least in some respects, a domestic organization. On this point, the parties offer divergent views. MCASO asserts that AHIF-Oregon is a wholly domestic organization, so *HLP* does not apply. *See id.* at 2730 ("We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations."). In OFAC's view, AHIF-Oregon is nothing more than a branch office of the larger global AHIF organization. Because AHIF-Oregon is a part of a foreign organization, OFAC argues, AHIF-Oregon is no different than the designated foreign terrorist organizations in *HLP*, and *HLP* controls here.

Both parties oversimplify the issue. AHIF-Oregon is neither wholly domestic nor wholly foreign. It is a domestic organization because it is incorporated under Oregon law, it is physically located in Oregon, it has funds in domestic bank accounts, and it has conducted most of its activities in the United States. But it also has ties to the larger AHIF organization because of the overlap between its founding members and those of foreign entities and because of its interactions

---

[19]We also note that MCASO is no stranger to AHIF-Oregon. MCASO explains in the complaint that it has engaged in coordinated activities with AHIF-Oregon in the past and "would like to continue to work with [AHIF-Oregon] in its former activities."

and communications with AHIF-Saudi Arabia and other AHIF branches. We therefore reject both parties' facile descriptions of the domestic or foreign nature of AHIF-Oregon. The extent to which the entity is domestic or foreign matters only to the extent that it bears on the three rationales advanced by the Supreme Court in *HLP*, to which we now turn.[20]

1. *Money is Fungible*

The Supreme Court upheld the prohibition of specified services related to an entity's peaceful ends in significant part because "[m]oney is fungible." *Id.* at 2725. Funds raised by an entity for its peaceful ends can be directed to its terrorist objectives and, at the very least, giving money for one purpose frees up funds that can be used in aid of terrorism. *Id.* at 2725-26. As the Court clarified in a footnote, the same reasoning applies to non-financial gifts, such as the provision of services. *Id.* at 2726 n.6. The wholly foreign entities at issue in *HLP* had ready access to funds through their foreign coffers; indeed, the entities were engaged in an active war with Turkey. *Id.* at 2726-27. Additionally, the record showed that the entities had used funds that had been raised for humanitarian purposes to pursue violent activities. *Id.* at 2725-26.

This rationale has very little force with respect to MCASO's proposed activities. To the extent that coordinated advocacy with MCASO could free up AHIF-Oregon's assets for sinister purposes, AHIF-Oregon has no assets available. OFAC has frozen all of AHIF-Oregon's assets.

OFAC responds that AHIF-Oregon is nothing more than a branch office of the larger, international AHIF organization and that the global organization has unfrozen assets in foreign countries. This is a fair point. As discussed earlier, substantial

---

[20]OFAC has not advanced, and we cannot think of, any additional rationales that might support the ban on coordinated advocacy. We therefore limit our discussion to the three rationales advanced by the Court in *HLP*.

evidence supports OFAC's view that AHIF-Oregon is a branch office of the larger AHIF organization. Viewed as a singular entity, MCASO's coordinated advocacy with AHIF-Oregon theoretically could free up funds held by the larger AHIF organization for terrorist activities. But that theoretical possibility goes only so far.

The larger AHIF organization is not entirely a singular entity. MCASO seeks to advocate with and on behalf of *AHIF-Oregon*, not the larger AHIF organization. We do not question that the support of a domestic branch office could aid the larger international organization to some extent. But, in contrast to the direct aid to the wholly foreign organization at issue in *HLP* and the clear possibility of freeing up assets, the link between the services at issue here and the freeing of resources is less direct and more speculative.

Relatedly, in *HLP* specific evidence, in the form of sworn affidavits, demonstrated that the entities had siphoned off humanitarian funding for violent purposes. By contrast, there is no evidence that, since the designation of AHIF-Oregon, the larger AHIF organization has spent any funds, or would spend any funds, supporting AHIF-Oregon. In the many years since its designation, the larger AHIF organization apparently has left AHIF-Oregon to its own, frozen devices. It is only speculative to conclude that aiding AHIF-Oregon with its public relations campaign would free up resources heretofore not spent by the larger AHIF organization. In addressing the plaintiffs' first proposed activity in *HLP*, the Court found that the possibility of the designated entities using the training for sinister purposes "is real, not remote." 130 S. Ct. at 2729. With respect to the plaintiffs' other proposed activity in *HLP*, the Court found that the training could be used to receive "monetary relief." *Id.* We do not suggest that OFAC's concerns here are unfounded; we hold only that the connection between the provision of services and the freeing of funds for terrorist activities is much more attenuated here than in *HLP*.

### 2.  *Legitimacy Concerns*

The Supreme Court's second rationale was that coordinated advocacy would help legitimize a terrorist organization, which "makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks." *Id.* at 2725. This rationale applies with almost equal force here. MCASO's coordinated advocacy with AHIF-Oregon would increase that organization's legitimacy, which could aid its ability to persist and to recruit members. Additionally, although there is some attenuation, as discussed above, coordinated advocacy with AHIF-Oregon might aid the larger AHIF organization's efforts to raise funds.

We note, however, that this rationale is not particularly strong. As noted above, an organization may advocate vigorously on behalf of the designated entity so long as that advocacy is independent. We see only a small difference, for purposes of determining the legitimizing effect, between a vigorous independent advocacy campaign and a coordinated advocacy campaign. Because the Supreme Court did not reach the issue of "coordinated advocacy," we do not know its view on whether this rationale would apply to pure-speech activities like a coordinated press conference. We will assume that there is some small additional legitimization by being able, for instance, to state that a legitimate organization's public relations campaign is "on behalf of" a designated entity or to coordinate efforts with the designated entity.

### 3.  *Foreign Policy Concerns*

The Supreme Court's final rationale was that "[p]roviding foreign terrorist groups with material support in any form also furthers terrorism by straining the United States' relationships with its allies and undermining cooperative efforts between nations to prevent terrorist attacks." *Id.* at 2726. In *HLP*, the government supported that rationale with a sworn affidavit describing "a violent insurgency waged by" one of the foreign

designated entities against Turkey and describing the direct effect of foreign activities of the designated entities on the foreign relations of the United States. *Id.* The Republic of Turkey "would react sharply to Americans furnishing material support to foreign groups . . . and would hardly be mollified by the explanation that the support was meant only to further those groups' 'legitimate' activities. From Turkey's perspective, there likely are no such activities." *Id.* at 2726-27.

Like the rationale concerning the fungibility of money, we conclude that this rationale has some, but very little, force here. Unlike the specific evidence of ongoing conflicts between the foreign organization and an ally of the United States, OFAC here offers only *past* conduct by *other* branches of the larger AHIF organization as evidence of potential strain in the United States' foreign relations. Moreover, the Supreme Court's concern about foreign nations' perception of "Americans furnishing material support to *foreign* groups," *id.* at 2726 (emphasis added), is diminished to some extent here because MCASO seeks to assist only AHIF-Oregon, a *domestic* branch of AHIF. Admittedly, foreign nations may not appreciate that distinction fully, just as the Court noted that nations may not appreciate the legitimate/illegitimate distinction. But the ability of the United States to explain that it permits *coordinated advocacy only* and with respect to *only the domestic branch* of AHIF distinguishes this case from the direct training of a wholly foreign organization actively at war with an ally, at issue in *HLP*.

### 4.  *Conclusion*

**[29]** The Supreme Court's rationales in *HLP* apply to the circumstances here, but they apply much more weakly. As the Supreme Court instructed, prohibitions against the content of speech, such as those here, must survive strict scrutiny. For that reason, and because the Court carefully circumscribed its analysis in *HLP*, we are hesitant to apply that decision to facts far beyond those at issue in that case. *See* 130 S. Ct. at 2712

("We do not . . . address the resolution of more difficult cases
. . . ."); *id.* at 2730 ("[W]e in no way suggest that a regulation
of independent speech would pass constitutional muster, even
if the Government were to show that such speech benefits for-
eign terrorist organizations."); *id.* ("We . . . do not suggest
that Congress could extend the same prohibition on material
support at issue here to domestic organizations."). Indeed, the
Court's analysis applied only to the two forms of direct train-
ing that the plaintiffs sought to provide to the designated enti-
ties in that case. The Court specifically declined to decide
whether Congress permissibly could ban coordinated advo-
cacy, such as the advocacy sought here by MCASO. In the
final analysis, *HLP* involved wholly foreign organizations
currently at war with a United States ally, involved specific
evidence concerning the continuing terrorist activities of those
organizations and the ability of those organizations to mis-use
the support offered by the plaintiffs, and involved proposed
training that had a "real, not remote" possibility of furthering
terrorism. *Id.* at 2729. By contrast, we address a domestic
branch of an international organization with little evidence
that the pure-speech activities proposed by MCASO on behalf
of the domestic branch will aid the larger international organi-
zation's sinister purposes. In these circumstances, we hold
that OFAC's content-based prohibitions on speech violate the
First Amendment. We therefore reverse the district court's
dismissal of Plaintiffs' First Amendment claim.

## CONCLUSION

In summary, we hold as follows:

1.   Substantial evidence supports the redesignation of
AHIF-Oregon as a specially designated global terrorist under
EO 13,224, for two of the three reasons advanced by OFAC.
We affirm the district court's ruling to that effect under the
Administrative Procedure Act.

2.   OFAC may rely on classified information to make a
designation decision. But OFAC violated AHIF-Oregon's

Fifth Amendment right to due process by failing to provide constitutionally adequate notice and a meaningful opportunity to respond, and by failing to mitigate the use of classified information by, for example, preparing and disclosing an unclassified summary. Nonetheless, because the outcome of the designation process in this instance would not have been altered by respecting those due process rights, those constitutional errors were harmless and no judicial relief is available to AHIF-Oregon. Again, we affirm the district court's ruling.

3.    OFAC violated AHIF-Oregon's Fourth Amendment right to be free from unreasonable seizures when it froze that domestic entity's assets without ever obtaining a warrant. Accordingly, we reverse the district court's contrary ruling. With respect to any potential remedy, because the parties did not brief the issue and because the district court has not ruled on it, we remand for that court to consider, in the first instance, what relief, if any, may be available to AHIF-Oregon.

4.    MCASO has a First Amendment right to engage in the forms of coordinated advocacy that it seeks, such as holding a joint press conference with AHIF-Oregon. The content-based prohibitions on MCASO's speech violate the First Amendment. We therefore reverse the district court's dismissal of Plaintiffs' First Amendment claim.

**AFFIRMED in part, REVERSED in part, and REMANDED.** The parties shall bear their own costs of appeal.